.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

| | | |
|---|---|---|
| E. B. GORHAM, Individually and on Behalf of All Others Similarly Situated,<br><br>               Plaintiff,<br><br>vs.<br><br>GENERAL GROWTH PROPERTIES, INC., JOHN BUCKSBAUM, BERNARD FREIBAUM, JOEL BAYER, EDMUND HOYT, JEAN SCHLEMMER and ROBERT A. MICHAELS,<br><br>               Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No.<br><br><br><br><br><br><br><br><br><br><br><br>DEMAND FOR JURY TRIAL |

FILED: OCTOBER 31, 2008

08 CV 6258

JUDGE SHADUR

MAGISTRATE JUDGE NOLAN

BR

CLASS ACTION COMPLAINT FOR
VIOLATION OF THE FEDERAL SECURITIES LAWS

## INTRODUCTION AND OVERVIEW

1.     This is a class action for violations of the anti-fraud provisions of the federal securities laws on behalf of all purchasers of General Growth Properties, Inc. ("General Growth" or the "Company") common stock between April 30, 2008 and October 26, 2008, inclusive (the "Class Period"), who were damaged thereby (the "Class").

2.     General Growth is a self-administered and self-managed real estate investment trust. The Company was founded in 1986 and is based in Chicago, Illinois.

3.     During the Class Period, defendants made false and misleading statements about General Growth's access to financing. Specifically, defendants represented that General Growth had the ability to refinance billions of dollars in debt that was coming due in the fall of 2008 and spring of 2009 on acceptable terms. In fact, General Growth did not have access to such financing. Further, defendants failed to disclose that the Company's President/Chief Operating Officer and its Chief Financial Officer had received loans from the Chief Executive Officer's family trust in violation of the Company's own Code of Business Conduct and Ethics.

4.     Beginning on September 22, 2008, investors slowly began to learn the truth about General Growth. As a result, General Growth's stock price dropped from a Class Period high of $43.83 to less than $2 per share. This decrease in General Growth's stock price was a result of the artificial inflation caused by defendants' misleading statements coming out of the stock price.

## JURISDICTION AND VENUE

5.     The claims asserted arise under §§10(b) and 20(a) of the Securities Exchange Act of 1934 ("1934 Act"), 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5, 17 C.F.R. §240.10b-5. Jurisdiction is conferred by §27 of the 1934 Act, 15 U.S.C. §78aa. Venue is proper pursuant to §27 of the 1934 Act. General Growth's headquarters are located in Chicago, Illinois, and false

statements were made in this District and acts giving rise to the violations complained of occurred in this District.

## THE PARTIES

**A.     Plaintiff**

6.      E. B. Gorham purchased General Growth common stock during the Class Period as set forth in the attached certification and was damaged thereby.

**B.     Defendants**

7.      General Growth is a self-administered and self-managed real estate investment trust with its headquarters located in Chicago, Illinois.  General Growth's stock is traded under the symbol GGP on the New York Stock Exchange, which is an efficient market.

8.      John Bucksbaum ("Bucksbaum") was, at all relevant times, Chairman and Chief Executive Office ("CEO") of the Company.

9.      Bernard Freibaum ("Freibaum") was, until October 3, 2008, Chief Financial Officer ("CFO") of the Company.

10.     Joel Bayer ("Bayer") was, at all relevant times, Senior Vice President and Chief Investment Officer of the Company.

11.     Edmund Hoyt ("Hoyt") was, at all relevant times, Senior Vice President of the Company.  Hoyt has served as CFO since October 3, 2008.

12.     Jean Schlemmer ("Schlemmer") was, at all relevant times, Executive Vice President and Chief Corporate Development Officer of the Company.

13.     Robert A. Michaels ("Michaels") was, at all relevant times, President and Chief Operating Officer ("COO") of the Company.

14.     The defendants named in ¶¶8-13 are referred to herein as the "Individual Defendants."

## SCIENTER

15.     During the Class Period, the defendants had both the motive and opportunity to conduct fraud. They also had actual knowledge of the misleading nature of the statements they made or acted in reckless disregard of the true information known to them at the time. In so doing, the defendants participated in a scheme to defraud and committed acts, practices and participated in a course of business that operated as a fraud or deceit on purchasers of General Growth common stock during the Class Period.

## INSIDER TRADING

16.     Throughout the Class Period, defendants sold General Growth stock at suspicious times and in suspicious amounts supporting a strong inference of their scienter. Those sales were as follows:

| Last Name | First Name | Date | Shares | Price | Proceeds |
|-----------|-----------|------|--------|-------|----------|
| BAYER | JOEL | 9/17/2008 | 500,000 | $20.43 | $10,215,000 |
| | | 9/23/2008 | 249,500 | $17.27 | $4,308,865 |
| | | 9/24/2008 | 150,500 | $15.53 | $2,337,265 |
| | | | 900,000 | | $16,861,130 |
| | | | | | |
| FREIBAUM | BERNARD | 9/18/2008 | 200,200 | $16.89 | $3,381,378 |
| | | 9/18/2008 | 114,500 | $18.55 | $2,123,975 |
| | | 9/18/2008 | 85,300 | $19.10 | $1,629,230 |
| | | 9/18/2008 | 44,200 | $19.92 | $880,464 |
| | | 9/19/2008 | 801,900 | $22.43 | $17,986,617 |
| | | 9/19/2008 | 187,400 | $21.52 | $4,032,848 |
| | | 9/19/2008 | 66,500 | $20.62 | $1,371,230 |
| | | 9/23/2008 | 1,247,500 | $17.25 | $21,519,375 |
| | | 9/23/2008 | 2,500 | $17.86 | $44,650 |
| | | 9/25/2008 | 431,455 | $15.71 | $6,778,158 |
| | | 10/2/2008 | 1,391,976 | $8.93 | $12,430,346 |
| | | 10/2/2008 | 1,304,167 | $7.42 | $9,676,919 |
| | | 10/2/2008 | 253,857 | $7.59 | $1,926,775 |
| | | 10/3/2008 | 215,229 | $7.59 | $1,633,588 |
| | | 10/3/2008 | 64,971 | $7.59 | $493,130 |
| | | 10/3/2008 | 44,800 | $7.59 | $340,032 |
| | | | 6,456,455 | | $86,248,715 |
| | | | | | |
| HOYT | EDMUND | 9/22/2008 | 30,000 | $16.14 | $484,200 |
| | | 9/23/2008 | 21,000 | $17.20 | $361,200 |
| | | 9/24/2008 | 29,000 | $16.20 | $469,800 |
| | | 9/25/2008 | 30,000 | $15.74 | $472,200 |

| Last Name | First Name | Date | Shares | Price | Proceeds |
|-----------|-----------|------|--------|-------|----------|
| | | | 110,000 | | $1,787,400 |
| | | | | | |
| MICHAELS | ROBERT | 8/5/2008 | 700,000 | $27.13 | $18,991,000 |
| | | 9/19/2008 | 164,747 | $21.90 | $3,607,959 |
| | | 9/19/2008 | 75,050 | $21.16 | $1,588,058 |
| | | 9/19/2008 | 34,903 | $19.92 | $695,268 |
| | | 9/19/2008 | 13,100 | $20.25 | $265,275 |
| | | 9/19/2008 | 9,600 | $22.65 | $217,440 |
| | | 9/19/2008 | 2,600 | $19.92 | $51,792 |
| | | 9/25/2008 | 198,600 | $15.79 | $3,135,894 |
| | | 9/25/2008 | 1,400 | $16.44 | $23,016 |
| | | | 1,200,000 | | $28,575,702 |
| | | | | | |
| SCHLEMMER | JEAN | 8/7/2008 | 50,000 | $27.29 | $1,364,500 |
| | | 9/19/2008 | 50,000 | $21.67 | $1,083,500 |
| | | 9/23/2008 | 60,000 | $17.35 | $1,041,000 |
| | | | 160,000 | | $3,489,000 |
| | | | | | |
| | | | **8,826,455** | | **$136,961,947** |

## PRE-CLASS PERIOD STATEMENTS

17.     On March 24, 2008, the Company filed a proxy statement with the SEC, which stated

in part:

### *Code of Business Conduct and Ethics*

Our Code of Business Conduct and Ethics prohibits conflicts of interest, which are broadly defined to include any situation where a person's private interest interferes in any way with the interests of the Company. ***In addition, this Code prohibits direct or indirect personal loans to executive officers and directors.***

## FALSE AND MISLEADING
## STATEMENTS DURING THE CLASS PERIOD

18.     On April 30, 2008, on the Company's Q1 2008 earnings conference call, defendants

made the following statements:

Michael Bilerman – *Citi – Analyst*:

It's Michael Bilerman here with Ambika as well. Bernie, can you just go over -- you had Fashion Show and Palazzo, which have a maturity date later this year. I'm not sure if you have extension options there. Can you just go over those loans as well? What proceeds did you use to repay the $522 million on the bridge?

[Freibaum:]

I can answer the latter part first. As I said, we got $375 million of new mortgages, so that was $375 million out of the $522 million. The other $147 million was the combination of cash that we had left over from the equity offering that we did at the end of March plus a small amount of draw on our revolving credit facility.

The mortgages on Fashion Show and Palazzo were very purposeful when we did them in January, and they each had a different rationale. Palazzo is a brand-new project. It's just opening. Many of the tenets are not open yet. The sales there, given the project that it's located in, is still opening in some ways with respect to the rooms that are available; getting the people that come to Las Vegas more familiar with the project; and the structure under which we purchased the asset, whereby we paid an initial price based on estimated NOI and then there will be additional payments throughout the next three years that will take into account the additional NOI. So any type of a long-term mortgage on Palazzo made no sense whatsoever.

And in fact, we wanted it to be near the end of the year because the mortgage on the adjoining property, which is literally physically connected to the Palazzo, the Grand Canal Shoppes, it comes due in May, I believe, of '09, but it's open to be prepaid in early '09.

And the huge improvement in NOI that we have had on that center compared to when we purchased it, will provide us a huge amount of additional proceeds, which may make sense for us to take the Palazzo and the Grand Canal Shoppes and get a new mortgage that covers both of those assets. So we wanted the flexibility to potentially combine those two at year end or perhaps do something else.

Fashion Show is a little bit of a different situation. The income there continues to grow very significantly, well ahead of our comp NOI average, and we expect that to continue. There are other things that we've been telling people for years that we're trying to get done there, including getting a certain portion of the project land in the Northeast corner under control, where we might be able to do additional development of that site, given its highly lucrative location right on the strip. So we wanted that flexibility.

In January when that mortgage came due, we had offers from groups of life companies. We could have done a five-year or a ten-year mortgage at the same proceeds level, but given the things we want to change there and the outside growth in NOI, we didn't want to commit to a long-term mortgage there either. So given that those are two of our very best assets in our top five, no doubt, we have little concern about the ability to refinance them at the end of this year when they come due.

19.     On July 31, 2008, on the Company's second quarter 2008 earnings conference call, defendants made the following statements:

[Bucksbaum:]

[W]e have refinanced every mortgage that has come due in 2008, and we have multiple plans and options available to us to take care of our remaining 2008 and 2009 maturities.

*     *     *

[Friebaum:]

We currently have five additional wholly-owned malls and one joint venture mall that will mature in the fourth quarter of this year that still need to be refinanced. We anticipate closing a one-off replacement loan for the existing joint venture mortgage that will mature on November 10, 2008. We currently expect that the new loan will be for a much higher amount than the maturing loan, as we believe that the expiring loan represents only approximately 25% of the value of the property. Excess loan proceeds will be distributed to the partners, and our ownership share is 35%.

We currently anticipate that four of the aforementioned five wholly-owned malls, including Fashion Show mall, will be part of a much larger pool of properties that will include many other malls, with loans that mature in the first or second quarter of 2009. We are currently planning to sell only investment-grade rated bonds to numerous fixed-income investors.

It is incorrect to extrapolate that these bonds would sell for spreads that are similar to those that are currently available on resales of existing investment-grade CMBS notes. Existing CMBS notes of various vintages represent portions of loans on many assets of different qualities and risk profiles. The unrelated loans were made to different borrowers, and much less rigorous underwriting standards were utilized in the past.

In addition, for reasons unrelated to the quality of the loans, many holders of existing CMBS bonds are currently being forced to liquidate their positions at deeply depressed prices. We will offer new bond secured by conservatively leveraged, high-quality malls with stable and predictable cash flow. The malls are all owned and operated by general growth and will be cross-collateralized to provide further downside protection for the bondholders.

***Our discussions with a number of institutional fixed-income investors, that are potential buyers of the bonds, lead us to believe that there will be considerable interest on the part of very large debt players***. There have been virtually no new freshly underwritten investment-grade rated secured mortgage-backed bonds made available to the fixed income investor market for quite some time.

We currently anticipate offering these bonds for sale in mid-October or about 2.5 months from now. The actual number of malls that are part of the pool with loans that mature in 2009 will depend upon the amount of demand that we have for

the bonds in October. That said, we currently anticipate that we will probably sell at least $1 billion of bonds in mid-October.

As I previously said, Fashion Show mall will anchor the pool. It is one of only a handful of malls in the entire United States with current sales in excess of $1,100 per square foot, so it should generate a lot of debt investor interest. If there is additional demand at that time, we have enough malls that could be prepaid at par, such that we could sell as much as $2 billion of secured mortgage-backed bonds in mid-October.

As it just recently debuted, with some stores yet to open, the Shoppes at Palazzo are still not close to reaching their full cash flow potential. The Palazzo stores are contiguous to the Grand Canal Shoppes, which have current sales productivity of almost $1,200 per square foot. *We currently anticipate refinancing both properties at the same time in early 2009. We could either do a one-off club deal for a single mortgage secured by both the Grand Canal Shoppes and the Shoppes at Palazzo, or we could use both properties to anchor a second pool of cross-collateralized malls, for which we would offer freshly underwritten and newly rated secured mortgage bonds in the first quarter of 2009.*

\*       \*       \*

Now I would like to address capital plans for the intermediate term. Given the current constraining general availability of commercial mortgage financing, I am reluctant to precisely predict the amount of excess mortgage proceeds that we can generate over the next two years, as we replace our mortgage loans that will mature in 2009 and 2010. That said, our share of existing mortgage loans that will mature in 2009 is approximately $2.5 billion. Using what I believe is a conservative average cap rate of 6.75%, the assets encumbered by those mortgages would be valued at approximately $6.2 billion. Accordingly, the existing mortgages maturing in 2009 represent approximately 40% of the average value of those assets.

If, on average, we were to refinance all of the expiring 2009 mortgages at a 55% average loan to value level, we would generate approximately $900 million of excess proceeds in 2009. For hypothetical purposes only, if the weighted average constant on the new mortgage loans, including amortization, was 7%, the initial total debt service coverage would be approximately 1.75 times. For a mortgage investor, that represents very high and secure coverage for a mall with stable cash flow.

\*       \*       \*

Now the last-July $750 million unsecured bridge loan has been fully refinanced, our next significant maturity of non-mortgaged debt comes in March and April of 2009. At that time, an aggregate amount of $595 million of Rouse Company bonds will be due.

During the nine-month period from August 1, 2008 through April 30, 2009, we currently anticipate raising at least $750 million from the various types of non-debt capital that we described in our roadmap. To refresh your recollection, these

items include proceeds from the sale of non-core assets, primarily office buildings; preferred equity on individual under-leveraged malls with existing low leverage mortgages that don't mature for a number of years; and proceeds from entering into new joint ventures for malls that are currently wholly-owned.

During the next nine months, market conditions will determine the actual timing, dollar amounts, and the mix of non-debt capital that we will raise from each of the aforementioned or other possible sources. If general economic conditions improve, we can envision raising substantially more than $750 million. However, regardless of market conditions, we believe we can achieve our minimum objective. If we have completed a second major secured mortgage-backed bond financing prior to the maturity of the Rouse bonds, excess proceeds from that transaction would also be available to repay those bonds.

20.      On August 8, 2008, the Company filed a Form 10-Q with the Securities and

Exchange Commission ("SEC"), which stated in part:

Liquidity and Capital Resources.

As of June 30, 2008, we have approximately $2.42 billion and $3.08 billion in debt maturing in 2008 and 2009, respectively (see also Note 4). Approximately $837 million of such debt was refinanced in July 2008 and we are currently considering various types and forms of transactions to refinance the remaining debt, including mortgage financings, construction financings, other debt and preferred equity financings, venture partner equity capital and sales of non-core assets. In light of current retail and credit market conditions, we have also elected to defer for eighteen months approximately $500 million of development and redevelopment expenditures. We believe that such deferral will enhance the likelihood that these deferred development and redevelopment projects will open when general economic conditions are more favorable and when attractive financing is more generally available. Although such deferral reduces our current approved future development spending to approximately $1.03 billion, such amount is less than the aggregate costs necessary to complete all currently planned projects.

*We currently anticipate that we will be able to repay or refinance all of our debt on a timely basis, and believe we have adequate sources of funds to meet our short term cash needs.* However, given the continued weakness of the retail and credit markets, there can be no assurance that we can obtain such refinancing or additional capital on satisfactory terms. In the event that we are unable to refinance our debt on a timely basis and on acceptable terms, we will be required to take further steps to acquire the funds necessary to satisfy our short term cash needs . . . .

21.      Defendant Freibaum signed a certification filed with the Form 10-Q which stated:

I, Bernard Freibaum, certify that:

1.      I have reviewed this report on Form 10-Q of General Growth Properties, Inc.;

2.      Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.      Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.      The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a)      Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b)      Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c)      Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d)      Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting.

5.      The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent functions):

a)      All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably

likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

22. Defendant Freibaum signed another certification which stated:

In connection with the Quarterly Report of General Growth Properties, Inc. (the "Company") on Form 10-Q for the period ending June 30, 2008, as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Bernard Freibaum, in my capacity as Chief Financial Officer of the Company, do hereby certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that:

(1) The Report fully complies with the requirements of Section 13 (a) or 15 (d) of the Securities Exchange Act of 1934; and

(2) The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

23. Defendant Bucksbaum signed a certification which stated:

In connection with the Quarterly Report of General Growth Properties, Inc. (the "Company") on Form 10-Q for the period ending June 30, 2008, as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, John Bucksbaum, in my capacity as Chief Executive Officer of the Company, do hereby certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that:

(1) The Report fully complies with the requirements of Section 13 (a) or 15 (d) of the Securities Exchange Act of 1934; and

(2) The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

**THE TRUTH BEGINS TO EMERGE**

24. On September 22, 2008, the Company issued a press release entitled "General Growth Pursues Debt Reduction and Strategic Alternatives," which stated in part:

General Growth Properties, Inc. today announced that the Company's Board of Directors and management team is pursuing a comprehensive evaluation of its alternatives, both financial and strategic, in an effort to align the market value of the Company's common stock more closely with the intrinsic value of the Company's stable, high quality portfolio of real estate assets in good locations with significant barriers to entry. Occupancy reached a record high of 93.2% in the second quarter of

2008 and comparable net operating income continued to increase, even in a challenging consumer sales environment.

> The Company currently anticipates that it will be in a position to offer a long-term fixed-rate portfolio mortgage financing to lenders in mid to late November, and in the interim will actively pursue several sources of financing for the Company's near term maturing obligations. The Company and its advisors are also developing a comprehensive, strategic plan to generate capital from a variety of potential sources including, but not limited to, both core and non-core asset sales, the sale of joint venture or preferred equity in selected pools of its assets, a corporate level capital infusion, and/or strategic business combinations.

25.     As a result of this disclosure, General Growth's stock price dropped from $21.42 on September 19, 2008 to $16.08 on September 22, 2008, the next trading day. This decrease in General Growth's stock price was a result of the artificial inflation caused by defendants' misleading statements coming out of the stock price.

26.     On October 1, 2008, *The Wall Street Journal* published an article entitled "General Growth Properties' High-Risk Strategies Hit Home – Big Debts Incurred To Build Up Firm, Executives' Stock." The article stated in part:

> Senior executives at General Growth Properties Inc. built up the mall owner by loading it with debt and amassed their own wealth by borrowing heavily to buy its shares.

> Now, both high-risk strategies have come crashing down. General Growth's stock has cratered some 73% in the past year as investors have worried about the company's ability to repay its $27 billion in debt. Since early August, Chief Financial Officer Bernie Freibaum, Chief Operating Officer Bob Michaels and seven other executives have sold a collective 5.6 million of their shares – for roughly $112 million.

> *     *     *

> Coming problems include the company's need to refinance $1 billion in mortgages tied to its Fashion Show mall and Shoppes at the Palazzo, both in Las Vegas, which is due in November. Another thorny problem: The company has to repay $600 million in unsecured bonds in the spring. It is far from clear General Growth will be able to refinance that amount given the decline in retail values nationally and the tightness in the global credit markets.

27.     As a result of this disclosure, General Growth's stock price dropped from $14.62 to $7.59 the next day. This decrease in General Growth's stock price was a result of the artificial inflation caused by defendants' misleading statements coming out of the stock price.

28.     On October 3, 2008, the Company issued a press release entitled "General Growth Properties Announces Executive Change and Dividend Suspension," which stated in part:

> General Growth Properties, Inc. today announced the appointment of Edmund Hoyt as the Company's Chief Financial Officer on an interim basis. Mr. Hoyt succeeds Bernard Freibaum, who is no longer employed by the Company. The Company will promptly commence a search for a permanent chief financial officer.
>
> Mr. Hoyt has served as Senior Vice President and Chief Accounting Officer of the Company since 2000. Mr. Hoyt has been with the Company since 1986 and has held a variety of positions in financial planning, accounting and controllership roles.
>
> All continuing executive officers of the Company have informed the Company that they have repaid in full all previously existing margin loans and thus there will be no further sales of Company stock by those executive officers to satisfy margin calls. In addition, the Bucksbaum family interests have informed the Company that they have not sold any shares of Company stock and that they do not intend to sell any of their shares of Company stock. The Company has been informed by Mr. Freibaum that on October 2, 2008, he sold approximately 2.95 million shares of common stock to satisfy margin calls and applied all of the proceeds to repay outstanding margin debts. After those sales, Mr. Freibaum has informed the Company that he beneficially owns approximately 1.3 million shares of stock and has approximately $3.4 million of margin debt outstanding.
>
> The Company also announced that, given the uncertainty and volatility in the capital markets, and the fact that all distributions currently required to maintain REIT status have already been made this year, the Company's board of directors has determined to suspend the common stock dividend at this time. Such suspension will be reviewed by the Board in the context of the REIT requirements and the Company's ongoing capital position.

29.     Also on October 3, 2008, the *Chicago Tribune* published an article entitled "General Growth stock slides on report; Executives sold $40 million in shares." The article stated in part:

> Shares of General Growth Properties Inc. fell 48 percent Thursday to a 12-year low as investors grew concerned that the Chicago-based shopping mall operator won't be able to refinance almost $1 billion in debt that comes due in November.

The real estate investment trust's stock dropped $7.03, to $7.59, after San Francisco-based shareholder advisory firm Glass, Lewis & Co. issued a report Wednesday chastising General Growth executives for selling shares after they had lobbied to get the company on the no short-selling stock list.

\*       \*       \*

"It's time to end this charade," Glass, Lewis & Co. analyst Todd Fernandez said in the report. "If executives want to sell their stock, investors should be provided the same opportunity."

\*       \*       \*

The nation's second-largest shopping mall operator finds itself in a difficult spot as the credit markets have tightened and complicated its efforts to refinance $900 million in mortgage debt related to two shopping mall properties in Las Vegas. The debt is up for renewal Nov. 28, Laverty said.

30.    On October 6, 2008, Stifel Nicolaus analyst David Fick issued a report to investors stating that General Growth had bought too many properties using debt financing, which would soon come up for refinancing. Specifically, he stated that "'[t]he remaining 2008 mortgage maturities could prove difficult to refinance due to the large loan balances,'" including $650 million at its Fashion Show Mall property and $250 million at its Palazzo property. Fick noted the risk that management might have to raise money by selling shares, which would make current shareholders' holdings less valuable.

31.    As a result of this disclosure, General Growth's stock price dropped from $7.75 to $4.50 per share the next trading day. This decrease in General Growth's stock price was a result of the artificial inflation caused by defendants' misleading statements coming out of the stock price.

32.    On October 27, 2008, the Company issued a press release entitled "General Growth Announces Management Changes; Company Intends to Market Certain Las Vegas Properties for Sale." The release stated in part:

General Growth Properties, Inc. today announced that two independent directors of the company will assume senior management positions effective immediately. Adam Metz will serve as interim Chief Executive Officer, and Thomas H. Nolan Jr. will serve as interim President, positions previously held by John Bucksbaum and Robert

- 13 -

A. Michaels, respectively. Mr. Bucksbaum will continue to serve as Chairman and Mr. Michaels will continue to serve as Chief Operating Officer and a senior officer of the company. In order to maintain a majority of independent directors, Mr. Michaels has also given up his Board seat.

\*       \*       \*

Along with other assets currently being marketed, the company's Board of Directors and management team have elected to market for sale its portfolio of retail properties in Las Vegas, NV: Fashion Show Mall, Grand Canal Shoppes, and The Palazzo. Goldman, Sachs & Co. and Eastdil Secured will be jointly responsible for the marketing effort, which is expected to begin immediately. In conjunction with the sale process, the company is working with its syndicate of lenders on Fashion Show Mall and The Palazzo to extend the November 28, 2008 maturity date. The company continues to remain current on all of its debt obligations.

\*       \*       \*

The Company also announced that it has recently come to the attention of the Board that an affiliate of a Bucksbaum family trust advanced unsecured loans to Mr. Michaels and Bernard Freibaum, the company's former director and CFO, for the purpose of repaying personal margin debt relating to company stock. The loan to Mr. Michaels, which totaled $10 million, has been repaid in full. The loan to Mr. Freibaum, whose employment was terminated prior to the Board's knowledge of these loans, totaled $90 million and has $80 million presently outstanding.

33.     As a result of this disclosure, General Growth's stock price dropped from $2.17 to $1.97 per share the next trading day. This decrease in General Growth's stock price was a result of the artificial inflation caused by defendants' misleading statements coming out of the stock price.

## DEFENDANTS' STATEMENTS WERE FALSE AND MISLEADING

34.     During the Class Period, defendants made false and misleading statements about General Growth's access to financing. Specifically, defendants represented that General Growth would be able to refinance billions of dollars in debt that was coming due in the fall of 2008 and spring of 2009. In fact, General Growth was finding it very difficult to line up financing on acceptable terms. Further, defendants failed to disclose that defendants Michaels and Freibaum had received loans from defendant Bucksbaum's family trust in violation of the Company's Code of Business Conduct and Ethics.

## LOSS CAUSATION/ECONOMIC LOSS

35.    During the Class Period, as detailed herein, defendants made false and misleading statements about General Growth's access to financing and engaged in a scheme to deceive the market. This artificially inflated General Growth's stock price and operated as a fraud or deceit on the Class. Later, when defendants' prior misrepresentations and fraudulent conduct became apparent to the market, General Growth's stock price fell precipitously, as the prior artificial inflation came out of the stock price over time. As a result of their purchases of General Growth common stock during the Class Period, plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## NO SAFE HARBOR

36.    General Growth's verbal "Safe Harbor" warnings accompanying its oral forward-looking statements ("FLS") issued during the Class Period were ineffective to shield those statements from liability.

37.    The defendants are also liable for any false or misleading FLS pleaded because, at the time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was authorized and/or approved by an executive officer of General Growth who knew that the FLS was false. None of the historic or present tense statements made by defendants were assumptions underlying or relating to any plan, projection or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by defendants expressly related to or stated to be dependent on those historic or present tense statements when made. On the contrary, such statements concealed that General Growth did not have access to financing on acceptable terms to refinance billions of dollars of debt that was coming due in the fall of 2008 and spring of 2009.

## APPLICABILITY OF PRESUMPTION OF
## RELIANCE: FRAUD ON THE MARKET

38.     Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a)     Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)     The omissions and misrepresentations were material;

(c)     The Company's stock traded in an efficient market;

(d)     The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's stock; and

(e)     Plaintiff and other members of the Class purchased General Growth common stock between the time defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

39.     At all relevant times, the market for General Growth common stock was efficient for the following reasons, among others:

(a)     As a regulated issuer, General Growth filed periodic public reports with the SEC; and

(b)     General Growth regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts and other similar reporting services.

## CLASS ACTION ALLEGATIONS

40.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased General Growth common stock during the

Class Period (the "Class"). Excluded from the Class are defendants, directors and officers of General Growth, and their families and affiliates.

41.     The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. General Growth had more than 267 million shares of stock outstanding, owned by thousands of persons.

42.     There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

    (a)     Whether the 1934 Act was violated by defendants;

    (b)     Whether defendants omitted and/or misrepresented material facts;

    (c)     Whether defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

    (d)     Whether defendants knew or recklessly disregarded that their statements were false and misleading;

    (e)     Whether the price of General Growth common stock was artificially inflated; and

    (f)     The extent of damage sustained by Class members and the appropriate measure of damages.

43.     Plaintiff's claims are typical of those of the Class because plaintiff and the Class sustained damages from defendants' wrongful conduct.

44.     Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation. Plaintiff has no interests which conflict with those of the Class.

45.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## COUNT I

### For Violation of §10(b) of the 1934 Act
### and Rule 10b-5 Against All Defendants

46.     Plaintiff incorporates ¶¶1-45 by reference.

47.     During the Class Period, defendants disseminated or approved the false statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

48.     Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

     (a)     Employed devices, schemes, and artifices to defraud;

     (b)     Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

     (c)     Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of General Growth common stock during the Class Period.

49.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for General Growth common stock. Plaintiff and the Class would not have purchased General Growth common stock at the prices they paid, or at all, if

they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

50.     As a direct and proximate result of these defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their purchases of General Growth common stock during the Class Period.

## COUNT II

### For Violation of §20(a) of the 1934 Act Against All Defendants

51.     Plaintiff incorporates ¶¶1-50 by reference.

52.     The Individual Defendants acted as controlling persons of General Growth within the meaning of §20 of the 1934 Act.  By virtue of their positions and their power to control public statements about General Growth, the Individual Defendants had the power and ability to control the actions of General Growth and its employees.  General Growth controlled the Individual Defendants and its other officers and employees.  By reason of such conduct, defendants are liable pursuant to §20(a) of the 1934 Act.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for judgment as follows:

A.     Declaring this action to be a proper class action pursuant to Fed. R. Civ. P. 23;

B.     Awarding plaintiff and the members of the Class damages and interest;

C.     Awarding plaintiff's reasonable costs, including attorneys' fees; and

D.     Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED:  October 31, 2008                    Plaintiff


By:  s/Marvin A. Miller
MARVIN A. MILLER

LORI A. FANNING
MILLER LAW LLC
115 S. LaSalle Street, Suite 2910
Chicago, IL  60603
Telephone:  312/332-3400
312/676-2676 (fax)

DARREN J. ROBBINS
MATTHEW P. MONTGOMERY
COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)

Attorneys for Plaintiff

S:\CptDraft\Securities\Cpt General Growth.doc